IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-500

No. COA21-563

Filed 19 July 2022

Guilford County, No. 20 CVS 7369

SHARON L. WOODY, Plaintiff,

v.

ACCUQUEST HEARING CENTER, LLC, Defendant.

Appeal by plaintiff from order and judgment entered 27 April 2021 by Judge John O. Craig, III, in Guilford County Superior Court. Heard in the Court of Appeals 5 April 2022.

> *Higgins Benjamin, PLLC, by Robert N. Hunter, Jr., and Jonathan Wall, for plaintiff-appellant.*
>
> *A.Y. Strauss, LLC, by Kory Ann Ferro, pro hac vice, and Sharpless McClearn Lester Duffy, PA, by Frederick K. Sharpless, for defendant-appellee.*

ZACHARY, Judge.

¶ 1 Plaintiff Sharon L. Woody appeals from the trial court's order and judgment granting Defendant AccuQuest Hearing Center, LLC's motion to dismiss Plaintiff's claim for wrongful termination in violation of public policy. After careful review, we reverse and remand for further proceedings.

## ***Background***

¶ 2 This case arises out of Plaintiff's suit against Defendant alleging her wrongful

termination in violation of public policy. Plaintiff alleged as follows in her complaint: Defendant hired Plaintiff to serve as a patient care coordinator in October 2018. She worked in both of Defendant's Greensboro and High Point offices, "receiving positive performance reviews" in her first few months. In February 2019, she "began experiencing symptoms for which she sought the advice of a cardiologist[,]" who determined that she needed a cardiac ablation to correct her atrial fibrillation. On the last workday before Plaintiff's procedure, "the employee with primary responsibility for making bank deposits . . . failed to make deposits" for each office; consequently, Plaintiff took the deposits with her when she left work for the day. She intended to make the deposits that evening, but the bank was closed when she arrived. Plaintiff brought the deposits home and "kept them secure."

On 5 March 2019, Plaintiff had surgery, and she missed one week of work while she recuperated. On her first days back in each office she returned the deposits. On 13 March 2019, the employee tasked with making the bank deposits again failed to do so. Before beginning her shift on 14 March, Plaintiff picked up the deposits and delivered them to the bank when it opened.

Later that day, a member of Defendant's Human Resources Department called Plaintiff and informed her that "she was being terminated" because she had committed "multiple procedural violations in a short period of time." Although Plaintiff asked what procedures she violated, she was not provided with any detailed

examples of policies or procedures violated. Plaintiff was told she would receive an email "explaining the reason for the termination[,]" but she never received any such email, despite her follow-up request a few days later.

¶ 5 On 29 September 2019, Plaintiff filed suit against Defendant, claiming wrongful termination in violation of public policy. Plaintiff alleged, *inter alia*, that her "termination violated the established public policy of North Carolina as expressed in N.C[.]G.S. § 143-422.2"—the Equal Employment Practices Act ("EEPA")—"and as set forth in other statutes and regulations, such as the Persons with Disabilities Protection Act," ("PDPA"). *See* N.C. Gen. Stat. § 168A-1 *et seq.* (2019).

¶ 6 On 30 November 2019, Defendant filed a motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. Defendant also filed a memorandum in support of its motion to dismiss, in which it alleged that "Plaintiff's claim . . . is governed by the [PDPA], which she cite[d] to in her Complaint, as the exclusive statutory remedy[,]" and that therefore Plaintiff's common-law wrongful-discharge claim was time-barred by the 180-day statute of limitations provided by the PDPA. *See* N.C. Gen. Stat. § 168A-12.

¶ 7 On 16 March 2021, Defendant's motion to dismiss came on for hearing in Guilford County Superior Court. By order entered on 27 April 2021, the trial court dismissed Plaintiff's complaint with prejudice. The trial court specifically found and concluded that Plaintiff's "common law remedy [wa]s precluded under the statutory

provisions of the [PDPA,]" and therefore, Plaintiff's claim was time-barred by the PDPA's statute of limitations. Plaintiff timely filed notice of appeal.

## *Discussion*

¶ 8        On appeal, Plaintiff argues that the trial court erred by concluding that her common-law claim for wrongful discharge in violation of public policy was preempted by the PDPA, and thus granting Defendant's motion to dismiss. We agree.

### I.        **Standard of Review**

¶ 9        "We review de novo a trial court's order on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6)." *Bill Clark Homes of Raleigh, LLC v. Town of Fuquay-Varina*, 281 N.C. App. 1, 2021-NCCOA-688, ¶ 11. Similarly, "[q]uestions of statutory interpretation are ultimately questions of law for the courts and are reviewed de novo." *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547, 809 S.E.2d 853, 858 (2018) (citation omitted). When conducting de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the trial court." *Jackson v. Charlotte Mecklenburg Hosp. Auth.*, 238 N.C. App. 351, 353, 768 S.E.2d 23, 25 (2014) (citation omitted).

¶ 10        "When reviewing a motion to dismiss, an appellate court considers whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Deminski v. State Bd. of Educ.*, 377 N.C. 406, 2021-NCSC-58, ¶ 12 (citation and internal quotation marks omitted).

"The statute of limitations may provide the basis for dismissal on a motion pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) if the face of the complaint establishes that [the] plaintiff's claim is barred." *Liptrap v. City of High Point*, 128 N.C. App. 353, 355, 496 S.E.2d 817, 818, *disc. review denied*, 348 N.C. 73, 505 S.E.2d 874 (1998). "In reviewing a trial court's Rule 12(b)(6) dismissal the issue for the court is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claim." *Bill Clark Homes*, 2021-NCCOA-688, ¶ 12 (citation and internal quotation marks omitted).

## II.    Preemption

On appeal, Plaintiff argues that the trial court erred in concluding that her common-law claim for wrongful discharge in violation of public policy was preempted by the PDPA. Defendant frames the question presented as one of first impression for our appellate courts: whether the PDPA preempts Plaintiff's common-law wrongful-discharge claim, such that the PDPA's 180-day statute of limitations controls the case at bar, *see* N.C. Gen. Stat. § 168A-12, rather than the three-year statute of limitations that applies to the common-law claim of wrongful discharge in violation of public policy, *see id.* § 1-52(1); *Winston v. Livingstone Coll., Inc.*, 210 N.C. App. 486, 488, 707 S.E.2d 768, 770 (2011) ("The limitations period for a tort action based upon wrongful discharge in violation of public policy is three years."). For the reasons that follow, we conclude that it does not.

¶ 12 "Ordinarily, an employee without a definite term of employment is an employee at will and may be discharged without reason." *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 446 (1989). However, it is well settled that "[w]hile there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy." *Id.* at 175, 381 S.E.2d at 447 (citation omitted). "Public policy has been defined as the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." *Id.* at 175 n.2, 381 S.E.2d at 447 n.2.

¶ 13 In the case at bar, Plaintiff raises both the EEPA and the PDPA in support of her claim. The EEPA declares, in pertinent part, that "the public policy of this State [is] to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2(a). The PDPA provides, in pertinent part and as quoted by Plaintiff:

> (a) The purpose of [the PDPA] is to ensure equality of opportunity, to promote independent living, self-determination, and economic self-sufficiency, and to encourage and enable all persons with disabilities to participate fully to the maximum extent of their abilities in the social and economic life of the State, to engage in remunerative employment, to use available public

accommodations and public services, and to otherwise pursue their rights and privileges as inhabitants of this State.

(b) The General Assembly finds that: the practice of discrimination based upon a disabling condition is contrary to the public interest and to the principles of freedom and equality of opportunity; the practice of discrimination on the basis of a disabling condition threatens the rights and proper privileges of the inhabitants of this State; and such discrimination results in a failure to realize the productive capacity of individuals to their fullest extent.

*Id.* § 168A-2.

¶ 14    Taking the allegations of Plaintiff's complaint as true, as we must at this stage, *Deminski*, 377 N.C. 406, 2021-NCSC-58, ¶ 12, Defendant violated the public policy of North Carolina as expressed by our legislature by terminating Plaintiff's employment because of her disability. Defendant contends, however, that the General Assembly intended for the PDPA to be the exclusive statutory remedy for Plaintiff's claim, thus preempting the common law and preventing Plaintiff from seeking common-law tort remedies for wrongful discharge in violation of public policy.

¶ 15    Our Supreme Court has explained that the public-policy exception to the employment-at-will doctrine is "designed to vindicate the rights of employees fired for reasons offensive to the public policy of this State. The existence of other remedies, therefore, does not render the public policy exception moot." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 356, 416 S.E.2d 166, 171 (1992).

¶ 16 Nevertheless, "a legislative remedy may be deemed exclusive" in certain circumstances:

> If federal legislation preempts state law under the Supremacy Clause, U.S. Const. art. VI, cl. 2, then state claims, such as one for wrongful discharge, will be precluded. Additionally, if our state legislature has expressed its intent to supplant the common law with exclusive statutory remedies, then common law actions, such as wrongful discharge, will be precluded.

*Id.* (citation omitted).

¶ 17 In sum, a party may bring a common-law claim for wrongful discharge in violation of public policy in the absence of "(a) federal preemption or (b) the intent of our state legislature to supplant the common law with exclusive statutory remedies[.]" *Id.* at 356–57, 416 S.E.2d at 171. This is the framework that guides our analysis of this case.

¶ 18 There is no claim of federal preemption in the instant case. Instead, Defendant alleged in its memorandum in support of its motion to dismiss that the General Assembly enacted the PDPA "to preclude a common law cause of action as to disability discrimination in favor of an exclusive statutory remedy under the PDPA." Accordingly, the resolution of this case turns on that question.

¶ 19 "In determining whether the state legislature intended to preclude common law actions, we first look to the words of the statute to see if the legislature expressly precluded common law remedies." *Id.* at 358, 416 S.E.2d at 172. As Defendant

acknowledges, the PDPA "contains no specific language of preemption of the common law claim[.]" Accordingly, "[b]ecause the legislature did not expressly preclude common law remedies, we look to the purpose and spirit of the statute and what the enactment sought to accomplish, considering both the history and circumstances surrounding the legislation and the reason for its enactment." *Id.* (citation and internal quotation marks omitted).

¶ 20    In seeking to ascertain the purpose and spirit of a statute, we consider "the policy objectives behind [its] passage and the consequences which would follow from a construction one way or another. A construction which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language." *Elec. Supply Co. of Durham, Inc. v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991) (citations and internal quotation marks omitted). We may also consider canons of statutory construction, but "[a]n analysis utilizing the plain language of the statute and the canons of construction must be done in a manner which harmonizes with the underlying reason and purpose of the statute." *Id.*

¶ 21    We first review the history and circumstances surrounding the enactment of the PDPA, in light of both the EEPA and the common-law claim of wrongful discharge in violation of public policy. As our Supreme Court noted in *Amos*, "[i]t seems elementary that before a legislative body can intend to eliminate certain forms of

remedy it must be aware that such remedies exist." 331 N.C. at 359, 416 S.E.2d at 173 (citation omitted).

¶ 22       The EEPA was enacted in 1977 and, as stated above, provides that the public policy of North Carolina is "to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2(a). Although no private cause of action exists under the EEPA, "[t]his Court has repeatedly recognized that the EEPA may form the basis for a wrongful discharge claim." *Jarman v. Deason*, 173 N.C. App. 297, 301, 618 S.E.2d 776, 779 (2005) (Geer, J., concurring).

¶ 23       The PDPA was enacted in 1985[1] and, as stated above, provides its own statement of purpose. *See* N.C. Gen. Stat. § 168A-2. In pertinent part, the PDPA recognizes the right of persons with disabilities "to engage in remunerative employment," *id.* § 168A-2(a), and finds that discrimination on the basis of disability "is contrary to the public interest and to the principles of freedom and equality of

---

[1] The PDPA was originally titled the "North Carolina Handicapped Persons Protection Act," but effective 1 October 1999, the Act was renamed "and amended such that 'person with a disability' [wa]s generally substituted for 'handicapped person' throughout" the PDPA. *Simmons v. Chemol Corp.*, 137 N.C. App. 319, 322, 528 S.E.2d 368, 370 (2000). For ease of reading, we refer to it as the PDPA throughout our rendition of its history.

opportunity[,]" *id.* § 168A-2(b). The PDPA provides a cause of action, with a 180-day statute of limitations, for persons with disabilities aggrieved by discrimination in employment. *Id.* §§ 168A-5, -11 to -12.

¶ 24    The PDPA was enacted in the midst of our appellate courts' recognition of the public-policy exception to the employment-at-will doctrine. Our General Assembly ratified the PDPA on 3 July 1985, and it became effective 1 October 1985. An Act to Protect Handicapped Persons, ch. 571, § 4, 1985 N.C. Sess. Laws 649, 656. Meanwhile, this Court first recognized the public-policy exception in *Sides v. Duke University*, which was published on 7 May 1985 and which our Supreme Court declined to review on 13 August 1985. 74 N.C. App. 331, 342–43, 328 S.E.2d 818, 826–27, *disc. review denied*, 314 N.C. 331, 335 S.E.2d 13 (1985). Our Supreme Court did not itself affirmatively recognize the public-policy exception until 1989. *Coman*, 325 N.C. at 176, 381 S.E.2d at 447–48.

¶ 25    Defendant argues that this history evinces our General Assembly's intent that the PDPA preempt the common-law claim of wrongful discharge in violation of public policy with respect to cases of disability discrimination. However, this chronological argument acknowledges but a small part of "the history and circumstances surrounding the [PDPA] and the reason for its enactment[,]" while ignoring "the purpose and spirit of the [PDPA] and what [its] enactment sought to accomplish[.]" *Amos*, 331 N.C. at 358, 416 S.E.2d at 172 (citation omitted).

¶ 26        Looking to the purpose and spirit of the PDPA, in concert with the EEPA as emblematic statements of the public policy of this state, our Supreme Court has consistently cautioned against precisely the argument that Defendant now makes. Defendant's contention—that the PDPA's statutory cause of action for disability discrimination in employment preempts the common-law claim of wrongful discharge in violation of public policy—disregards our Supreme Court's holding in *Amos* that "the availability of alternative remedies *does not prevent a plaintiff from seeking tort remedies for wrongful discharge based on the public policy exception.*" *Id.* at 356–57, 416 S.E.2d at 171 (emphasis added). This must be so, the *Amos* Court reasoned, because "[t]he availability of alternative common law and statutory remedies . . . *supplements rather than hinders the ultimate goal of protecting employees who have been fired in violation of public policy.*" *Id.* at 357, 416 S.E.2d at 171 (emphasis added).

¶ 27        Indeed, our Supreme Court has long recognized the rule that "if a statute is remedial in nature, seeking to advance the remedy and repress the evil[,] it must be liberally construed to effectuate the intent of the legislature." *Misenheimer v. Burris*, 360 N.C. 620, 623, 637 S.E.2d 173, 175 (2006) (citation and internal quotation marks omitted). Nearly two centuries ago, our Supreme Court concluded that the existence of a statutory remedy did not eliminate a remedy at common law, and described alternative statutory remedies as often "giving an easier or cumulative remedy for a wrong, for which there was an action at the common law." *McKay v. Woodle*, 28 N.C.

352, 353–54 (1846); *see also, e.g.*, *Humphrey v. Wade*, 70 N.C. 280, 281 (1874) ("[A]lthough the relief sought may possibly have been under the act of 1846, . . . that remedy is only cumulative . . . ."); *Oliveira v. Univ. of N.C.*, 62 N.C. 69, 70 (1867) ("Supposing, therefore, that the complainant has [a] complete remedy at law, . . . it is only concurrent, and not exclusive . . . .").

¶ 28 Consequently, adopting Defendant's preferred construction of the PDPA—by holding that its statutory remedy implicitly precludes a common-law claim, despite the absence of any evidence that the General Assembly intended such a result— would contravene this well-established maxim of remedial statutes. Stated another way, accepting Defendant's argument would require us "to [repress] the remedy and [advance] the evil" that our General Assembly sought to remedy. *Misenheimer*, 360 N.C. at 623, 637 S.E.2d at 175 (citation and internal quotation marks omitted).

¶ 29 In addition, Defendant asks that we ignore well-established canons of statutory construction by reading into the PDPA an implicit preclusion that is not explicit in its text. Our Supreme Court has often reiterated that "[c]ourts should give effect to the words actually used in a statute and should neither delete words that are used *nor insert words that are not used* into the relevant statutory language during the statutory construction process." *N.C. Farm Bureau Mut. Ins. Co. v. Dana*, 379 N.C. 502, 2021-NCSC-161, ¶ 16 (emphasis added). "Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*).

That is, a matter not covered is to be treated as not covered." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012); *see also Wilson Funeral Dirs., Inc. v. N.C. Bd. of Funeral Serv.*, 244 N.C. App. 768, 774, 781 S.E.2d 507, 511 (2016) (applying the *casus omissus* canon). Although the *casus omissus* canon allows for reasonable implications, Defendant's proposal does not fall within the boundary of our longstanding rule favoring the broad construction of statutory remedies.

¶ 30        Plaintiff argues that "this Court should not find some kind of implied 'exclusive remedy provision' where the legislature has remained silent[,]" observing that our General Assembly "is familiar with such clauses, such as in the area of workers['] compensation, where it provided a comprehensive statutory framework" that includes such an exclusive remedy provision. *See* N.C. Gen. Stat. § 97-10.1 ("[T]he rights and remedies herein granted . . . shall exclude all other rights and remedies . . . as against the employer at common law or otherwise . . . ."). Indeed, Defendant's chronological argument, discussed above, arguably weighs more heavily on this point, and favors Plaintiff. That our General Assembly—which explicitly precludes common-law remedies when it so chooses—declined to include an explicit preclusion provision in the PDPA either at its enactment or in its subsequent amendments speaks to the General Assembly's intent that the PDPA be viewed as a cumulative remedy, rather than exclusive or preclusive of the common-law cause of action.

¶ 31        Defendant relies heavily in its preclusion argument on *Lederer v. Hargraves Tech. Corp.*, in which a federal district court applied the *Amos* framework to conclude that our General Assembly "intended to preclude common law actions for wrongful discharge in violation of public policy with respect to members of the National Guard" by the enactment of N.C. Gen. Stat. §§ 127A-202, -202.1 and -203. 256 F. Supp. 2d 467, 472 (W.D.N.C. 2003). However, "[w]ith regard to matters of North Carolina state law, neither this Court nor our Supreme Court is bound by the decisions of federal courts, including the Supreme Court of the United States, although in our discretion we may conclude that the reasoning of such decisions is persuasive." *Salvie v. Med. Ctr. Pharmacy of Concord, Inc.*, 235 N.C. App. 489, 493 n.2, 762 S.E.2d 273, 277 n.2 (2014) (citation omitted).

¶ 32        Our careful review of *Lederer* shows it to be an outlier among decisions issued by other courts that have reviewed whether various statutes exclusively preempt the common-law claim of wrongful termination in violation of public policy. For example, "[o]ur courts have previously held that a plaintiff may pursue both a statutory claim under [the Retaliatory Employment Discrimination Act ("REDA")] and a common law wrongful discharge claim based on a violation of REDA." *White v. Cochran*, 216 N.C. App. 125, 133, 716 S.E.2d 420, 426 (2011). Neither does Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, preclude the common law claim. *See Atkins v. USF Dugan, Inc.*, 106 F. Supp. 2d 799, 810 (M.D.N.C. 1999) ("Consistent with *Amos*,

this Court finds that [the plaintiff]'s assertion of a Title VII claim does not preclude his discharge in violation of public policy cause of action . . . ."). *Atkins* also concerned concurrent claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, which the defendant moved to dismiss, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, which the defendant did not. 106 F. Supp. 2d at 801–02. The district court allowed the common-law claim to proceed alongside the three federal statutory claims. *Id.* at 814.

¶ 33        In sum, we conclude that the General Assembly did not intend for the PDPA to preclude the common-law claim of wrongful discharge in violation of public policy, in light of (1) the plain text of the PDPA; (2) the history and circumstances of the enactment of the PDPA in light of the EEPA and the common-law claim; (3) our longstanding principle of construing remedial statutes broadly; and (4) the guidance of several other applicable canons of statutory construction. As such, the trial court erred as a matter of law by concluding that the PDPA's 180-day statute of limitations bars Plaintiff's common-law claim of wrongful discharge in violation of public policy, and thus erred by dismissing Plaintiff's complaint as time-barred.

### III.    Failure to State a Claim

¶ 34        Our dissenting colleague contends that assuming, *arguendo*, that the PDPA's statute of limitations does not apply to—and therefore, bar—Plaintiff's common-law claim of wrongful discharge in violation of public policy, the trial court's order

granting Defendant's motion to dismiss should nevertheless be affirmed because "Plaintiff has failed to allege sufficient facts to establish she is a member of the protected class of disabled individuals." *Dissent* ¶ 71. However, upon careful review of the allegations of Plaintiff's complaint in the deferential light of our standard of review, we conclude that Plaintiff has pleaded a claim sufficient to survive Defendant's motion to dismiss.

¶ 35        As stated above, "[t]he standard of review of an order granting a Rule 12(b)(6) motion is whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true." *Bill Clark Homes*, 281 N.C. App. 1, 2021-NCCOA-688, ¶ 11 (citation omitted).

¶ 36        Although the EEPA declares that the public policy of this State is to protect against discrimination in employment on the basis of "handicap[,]" the EEPA does not itself define the word "handicap" as used in this context. *See* N.C. Gen. Stat. § 143-422.2 (containing no definition of "handicap"). However, this Court has previously determined that the PDPA's definition of "person with a disability" applies to common-law claims of wrongful discharge in violation of public policy, as set forth in the EEPA, prohibiting discrimination on account of a person's handicap or disability. *McCullough v. Branch Banking & Tr. Co.*, 136 N.C. App. 340, 347–48, 524 S.E.2d 569, 574 (2000). The PDPA defines "person with a disability" as: "Any person who (i)

has a physical or mental impairment which *substantially limits* one or more major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." N.C. Gen. Stat. § 168A-3(7a) (emphasis added).

¶ 37     The dissent views Plaintiff's complaint as alleging the bare possibility of a future impairment or handicap. Our dissenting colleague asserts that "Plaintiff merely alleges that she has a heart condition that requires occasional treatment which *could* be impairing in the future if untreated and that her condition 'impairs' her ability to walk and exercise." *Dissent* ¶ 74. However, our dissenting colleague argues, Plaintiff "does not expressly allege that her condition *substantially* impairs these activities, nor does she allege facts which show that her condition substantially impairs these activities." *Id.*

¶ 38     Yet, construing Plaintiff's complaint liberally and taking all allegations therein as true, as we must, *Bill Clark Homes*, 281 N.C. App. 1, 2021-NCCOA-688, ¶ 11, we conclude that Plaintiff's complaint is sufficient to survive Defendant's Rule 12(b)(6) motion. In her complaint, Plaintiff alleges the following facts:

> In February 2019, [Plaintiff] began experiencing symptoms for which she sought the advice of a cardiologist. It was determined that she suffered from a serious health condition that would require a cardiac ablation procedure. The procedure involves cauterizing arteries in the heart with the objective of correcting atrial fibrillation, an irregular and often rapid heartbeat that can increase the risk of strokes, heart failure, and other heart-related complications.

¶ 39    She also recounts the "many healthcare appointments" that her condition required and her week-long absence from work that was necessary for Plaintiff to undergo and recuperate from a cardiac ablation procedure.

¶ 40    In the portion of her complaint setting forth her wrongful-discharge allegations, Plaintiff adds that she "suffers from a disability. Her heart condition affects major life activities, such as walking and exercising, and if left untreated can lead to stroke or death. Plaintiff had a record of a disability at the time she was wrongfully terminated." She further alleges that she "was retaliated against and wrongfully discharged from her employment because of (a) her disability, (b) the time she took off to have her disability treated, and (c) Defendant's discrimination and preconceived notions about her future performance as an employee based on her disability." Lastly, she claims that her "medical condition and status as 'disabled' was a substantial factor in . . . Defendant's decision to terminate her employment."

¶ 41    Considering the PDPA's definition of "person with a disability," there does not appear to be any dispute that Plaintiff has pleaded: (1) that she has a record of (2) a physical impairment (atrial fibrillation) (3) that limits one or more major life activities.[2] Our dissenting colleague only challenges the sufficiency of Plaintiff's

---

[2] "[W]alking" is specifically included among the PDPA's non-exhaustive list of "[m]ajor life activities." N.C. Gen. Stat. § 168A-3(7a)(b). "A major life activity also includes the

allegations regarding the degree of her physical limitation—*i.e.*, whether her condition *substantially* limits these major life activities.

¶ 42    The dissent relies on *Burgess v. Joseph Schlitz Brewing Co.*, 298 N.C. 520, 259 S.E.2d 248 (1979), to support its contention that Plaintiff did not allege that her condition is *substantially* impairing. *Dissent* ¶ 74. In *Burgess*, our Supreme Court considered "whether a person who suffers from 'simple glaucoma,' but has 20/20 vision in both eyes with glasses, is a 'handicapped person' as defined" by the PDPA's predecessor statute. 298 N.C. at 522, 259 S.E.2d at 250. The *Burgess* Court concluded that "[f]airly construed, the remedial provisions of [the PDPA's predecessor statute] are intended to aid only those who are presently disabled. The problems of individuals, not presently disabled, who suffer from conditions which may or may not disable them in the future are beyond the scope of the statute." *Id.* at 528, 259 S.E.2d at 253–54. Thus, because the *Burgess* plaintiff alleged "that he has an eye disease but that his vision is functioning normally with glasses[,]" the Court concluded that the plaintiff was "not visually disabled within the meaning of the statute." *Id.* at 528, 259 S.E.2d at 253.

¶ 43    However, the use of eyeglasses to correct poor vision is specifically addressed in the PDPA. *See* N.C. Gen. Stat. § 168A-3(7a)(d) ("The determination of whether an

---

operation of a major bodily function, including, but not limited to, . . . circulatory . . . functions." *Id.*

impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures, such as . . . low-vision devices, *which do not include ordinary eyeglasses or contact lenses . . . .*" (emphasis added)). Thus, the PDPA instructs that "the ameliorative effects" of eyeglasses shall be considered in "[t]he determination of whether an impairment substantially limits a major life activity[,]" *id.*, making this specific example less than illustrative for the case at bar.

¶ 44        As for the broader holding of *Burgess*, there is little in Plaintiff's pleading that suggests that she is "not presently disabled"; rather, the issue seems to be that her pleading could be read to suggest that her condition "may or may not disable [her] in the future[.]" *Burgess*, 298 N.C. at 528, 259 S.E.2d at 253–54. But what speculative language exists in Plaintiff's complaint—concerning the potential dire effect of failing to treat the atrial fibrillation with the cardiac ablation procedure to which Plaintiff was compelled to submit—should not be overread to deny the existence of her present condition as pleaded in her complaint.

¶ 45        Plaintiff alleges in her complaint that she "had a record of a disability": namely, atrial fibrillation, which is "a serious health condition" that "affects major life activities" and, if left untreated, could "lead to stroke or death." Plaintiff also alleges that she had been experiencing symptoms serious enough to require her week-long absence from work so that she could undergo and recuperate from a cardiac ablation procedure. And Plaintiff alleges that she "was retaliated against and wrongfully

discharged from her employment because of (a) her disability, (b) the time she took off to have her disability treated, and (c) Defendant's discrimination and preconceived notions about her future performance as an employee based on her disability."

¶ 46 Altogether, construed liberally and taken as true, as we must at this stage of litigation, *Bill Clark Homes*, 281 N.C. App. 1, 2021-NCCOA-688, ¶ 11, the allegations of Plaintiff's complaint are sufficient to plead that Plaintiff is a "person with a disability," notwithstanding Plaintiff's omission of the word "substantially" from her description of the myriad ways her condition limits her major life activities.

¶ 47 At this juncture, this Court is not tasked with passing on the merits of Plaintiff's claim, only her pleading. We express no opinion on whether Plaintiff "will ultimately prevail" on the merits of her claim. *Id.* ¶ 12 (citation omitted). Our dissenting colleague posits that Plaintiff may have difficulty proving that she was terminated based on her disability; regardless, she has alleged facts supporting such a claim and we must not construe them unfavorably against her at this stage of the proceedings. Rather, we merely conclude that Plaintiff "is entitled to offer evidence to support [her] claim." *Id.* (citation omitted).

¶ 48 Our opinion sounds in the longstanding and oft-recognized principle that a remedial statute "should be construed liberally, in a manner which assures fulfillment of the beneficial goals for which it is enacted and which brings within it all cases fairly falling within its intended scope." *Burgess*, 298 N.C. at 524, 259 S.E.2d

at 251. Dismissal of Plaintiff's claim at this preliminary stage of litigation would frustrate those beneficial goals more than it would ensure their fulfillment.

## *Conclusion*

For the foregoing reasons, the trial court's order dismissing Plaintiff's claim is reversed, and this matter is remanded for further proceedings.

REVERSED AND REMANDED.

Judge ARROWOOD concurs.

Judge DILLON dissents by separate opinion.

DILLON, Judge, dissenting.

Though Plaintiff pleads in her complaint that she was terminated shortly after she retained for over a week funds her employer had directed to be deposit immediately into her employer's bank account, our role is to determine whether she has stated a claim for wrongful termination based on workplace disability discrimination. I conclude that she has not, as a matter of law for two independent reasons as explained below. Therefore, I respectfully dissent.

## I. No Common Law Action Exists.

First, I conclude that our General Assembly intended the *statutory* remedies it created in Section 168A-11 (the "1985 PDPA") to be exclusive, and not to co-exist with a judicially created, common law remedy based on that body's public policy pronouncement in N.C. Gen. Stat. § 143-422.2 (the "1977 EEPA"). And since Plaintiff did not file her claim within the applicable 180-day statute of limitations contained in the 1985 PDPA, Judge Craig was correct in dismissing the complaint.

In North Carolina, "[o]rdinarily, an employee without a definite term of employment is an employee at will and may be discharged without reason." *Coman v. Thomas Mfg.*, 325 N.C. 172, 175, 381 S.E.2d 445, 446 (1989). However, in 1989, our Supreme Court first recognized a cause of action under our common law for wrongful discharge where one is discharged "for an unlawful reason or purpose *that contravenes public policy*." *Id.* at 175, 381 S.E.2d at 447 (emphasis added). In *Coman*, the Court held that a trucker had stated a cause of action for wrongful termination

based on allegations he was terminated for refusing to falsify his driving log to show that he was not driving for periods in excess of that allowed under federal law. "Thus, according to plaintiff's allegations when defendant discharged plaintiff, if violated the federal regulations and the public policy of North Carolina as established in our Administrative Code." *Id.* at 176, 381 S.E.2d at 447. It should be noted that our General Assembly had, otherwise, not provided Mr. Coman with a remedy to sue for wrongful termination.

¶ 53        In the present case, however, our General Assembly has provided a remedy for wrongful termination based on workplace disability discrimination, through its passage of the 1985 PDPA. We are tasked to determine whether the 1985 PDPA constitutes Plaintiff's exclusive remedy or whether she also has a common law claim for wrongful termination based on a violation of the public policy announced by our General Assembly in the 1977 EEPA. Since the 1985 PDPA does not contain any express statement concerning whether the remedies contained in the 1985 PDPA are meant to be exclusive, our Supreme Court instructs that we are to "look to the purpose and spirit of the statute and what the enactment sought to accomplish, considering both the history and circumstances surrounding the legislation and the reasons for its enactment." *Amos v. Oakdale*, 331 N.C. 348, 358, 416 S.E.2d 166, 172 (1992).

¶ 54        Applying our Supreme Court's reasoning in *Amos* to the history and circumstances surrounding the passage of the 1985 PDPA, I conclude that our

General Assembly did not intend that a judicially created, common law action based on the 1977 EEPA was to co-exist with the cause of action it was establishing.

¶ 55        In *Amos*, our Supreme Court determined that the termination of the plaintiffs' employment for their refusal to work for less than the minimum wage established by our state's Wage and Hour Act violated the public policy of our State. *Id.* at 350, 416 S.E.2d at 167. The question, though, was whether the Act provided the sole remedy.

¶ 56        The Court recognized that the "strongest argument" for the remedies in the Act to be exclusive was that at the time the Act was passed, neither our Court or our Supreme Court "had recognized the public policy exception to the employment at-will doctrine." *Id.* at 358-59, 416 S.E.2d at 172.

¶ 57        The Court held, though, that the remedies provided by the Act was not exclusive because "[j]udging from these statutory remedies, it seems apparent that the intent of the legislature was to provide an employee an avenue to recover back wages *while remaining employed* . . . [but] provides *no remedy* for refusing to work for less than the statutory minimum wage." *Id.* at 358, 416 S.E.2d at 172.

¶ 58        Like the Wage and Hour Act, the 1985 PDPA was enacted before our Supreme Court recognized the public policy exception in *Coman* and at the time our Court first recognized the exception. *Sides v. Duke*, 74 N.C. App. 331, 342, 328 S.E.2d 818, 826 (1985). (The 1985 PDPA was introduced before our *Sides* opinion and enacted a few

months after *Sides*. I doubt *Sides*, which involved a different public policy concern was in our General Assembly's conscience when it considered the 1985 PDPA.)

¶ 59 However, unlike the Wage and Hour Act at issue in *Amos*, the 1985 PDPA does provide a comprehensive range of remedies, not only for those terminated or not hired based on their disability, but for those refusing to work under discriminatory conditions. Specifically, the 1985 PDPA mandates an employer to provide reasonable accommodations, a new duty not contemplated even in the 1977 EEPA which established the public policy. *See Head v. Adams Farm Living, Inc.*, 242 N.C. App. 546, 553, 775 S.E.2d 904, 909 (2015) (recognizing that unlike the 1985 PDPA, the 1977 EEPA "does *not* impose a corresponding duty of reasonable accommodation by an employer"). That is, under the 1977 EEPA, discriminatory practices included treating disabled persons who could otherwise perform a job differently than fully abled persons. The 1985 PDPA fully proscribes this practice *and adds* the failure to provide reasonable accommodations as a discriminatory practice.

¶ 60 I note that the language in the 1985 PDPA, its history, and other circumstances occurring around the time of its passage indicate that the 1985 PDPA was intended to be exclusive, as explained below.

¶ 61 The General Assembly already provided a remedy for workplace disability discrimination prior to the 1977 EEPA. Specifically, in 1973, our General Assembly enacted the Handicapped Persons Act (the predecessor of the 1985 PDPA), codified

in N.C. Gen. Stat. §§ 168-1, *et seq.* The 1973 Act was entitled "AN ACT TO PROVIDE FOR TREATMENT OF HANDICAPPED AND DISABLED PERSONS EQUAL TO THAT AFFORDED OTHER PERSONS[,]" and its stated purpose was to "encourage and enable handicapped persons to participate fully in the social and economic life of the State and to engage in remunerative employment." *Id.* § 168-1. One of the sections under the 1973 Act established certain rights to disabled individuals in the workplace, as follows:

> **Right to employment**. Handicapped persons shall be employed in [all] employment, both public and private, on the same terms and conditions as the able-bodied, unless it is show that the particular disability impairs the performance of the work involved.

N.C. Gen. Stat. § 168-6 (1973) (repealed and superseded by the 1985 PDPA). As the 1973 Act did not specify any statute of limitations, any claim filed for workplace disability discrimination was subject to the 3-year statute of limitations under N.C. Gen. Stat. 1-52(2). *Spaulding v. R.J. Reynolds Tobacco Co.*, 93 N.C. App. 770, 771-72, 379 S.E.2d 49, 50 (1989), *aff'd*, 326 N.C. 44, 387 S.E.2d 168 (1990).

¶ 62    In 1977, our General Assembly enacted the EEPA, which recognized as the public policy of our State that employers of fifteen (15) or more people should not discriminate based on "race, religion, color, national origin, age, sex or handicap[.]" N.C. Gen. Stat. § 143-422.2. The General Assembly certainly did not understand that this Act would be the basis of a new cause of action in addition to that provided in its

1973 Act, as no court had yet recognized a common law claim. The 1973 Act provided the cause of action, and the 1977 EEPA is clearly just a statement of public policy.

¶ 63 In 1985, our General Assembly replaced the portion of the 1973 Act dealing with workplace discrimination with the more robust 1985 PDPA. The language of the 1985 PDPA established a new cause of action with broader rights than that even contemplated in its 1970's legislation (as discussed above), again without any understanding that the cause of action was supplementing some common law claim as shown by the language in the Act.

¶ 64 The General Assembly repealed the section in the 1973 Act which initially created a cause of action for disability workplace discrimination. *See* 1985 Session Law, Chapter 571, Sec. 3 ("G.S. 168-6 is repealed.").

¶ 65 The "Statement of purpose" contained in the 1985 Act (codified in Chapter 168A-2) is substantially similar to the public policy as announced in the 1977 EEPA, as it relates to disabled persons.

¶ 66 Where its 1977 EEPA merely announces a public policy regarding discrimination by employers of 15 or more persons, the 1985 PDPA creates a cause of action against employers of 15 or more persons. *See* N.C. Gen. Stat. § 168A-3(2).

¶ 67 Our General Assembly made specific policy decisions for the procedure one would have to follow to pursue a claim for workplace disability

discrimination. For instance, the 1985 PDPA provides that actions for a discriminatory practice "shall be tried to the court without a jury." N.C. Gen. Stat. § 168A-11(a). The Act provides that an employer's liability for back pay shall be limited to two years. *Id.* § 168A-11(b). And the Act limits the time within which a plaintiff may sue for workplace disability discrimination to 180 days. It seems odd that our General Assembly would enact these limitations while intending litigants could sue for the same conduct without these limitations through a common law claim.

¶ 68 And the 1985 PDPA states that our State's jurisdiction to consider a plaintiff's claim under that Act ends after the plaintiff commences a federal action raising a claim under the Americans with Disabilities Act for the same conduct. *Id.* § 168A-11(c). There is no mention that jurisdiction for common law claims likewise ends. If our General Assembly understood that a common law claim existed, it seems that this statute would have been amended to include a statement that our State's jurisdiction to consider any such claim ends once a federal action was commenced. But that body did not reference any such claim.

¶ 69 Finally, I note that in 1990, the year after recognizing the public-policy exception in *Coman*, our Supreme Court affirmed a decision from our Court holding that a claim for workplace disability discrimination was subject to the 180-day

limitation period found in the 1985 PDPA that replaced the 1973 Act and, therefore was subject to the 180-day limitation period in the 1985 PDPA. *See Spaulding*, 93 N.C. App. at 773, 379 S.E.2d at 51, *aff'd*, 326 N.C. at 44, 387 S.E.2d at 168.[3]

¶ 70        There is a place for our courts to recognize a cause of action where an employer fires an at-will employee for a reason that violates some stated public policy. However, I do not believe that our Supreme Court intended for us to recognize a common law claim in the present context. Indeed, our General Assembly had already recognized the ill of workplace disability discrimination and created a cause of action for that ill four years prior to its public policy pronouncement in the 1977 EEPA. And in its 1985 PDPA, our General Assembly essentially restated the public policy contained in the 1977 EEPA when it repealed the 1973 Act and replaced it with legislation designed to remediate the public policy concern with broader rights.

## II. Failure to Allege "Substantial" Impairment

¶ 71        Even assuming North Carolina recognizes a common law claim for workplace disability discrimination, Plaintiff has failed to allege sufficient facts to establish she is a member of the protected class of disabled individuals.

---

[3] I do note that, in 2000, our Court held that certain jury instructions for a *common law* workplace disability claim based the 1977 EEPA were not erroneous, suggesting that North Carolina <u>does</u> recognize a common law cause of action apart from the 1985 PDPA. *See McCullough v. BB&T*, 136 N.C. App. 340, 524 S.E.2d 569 (2000). However, the record in that case shows that the defendant bank never raised the issue of preemption. Further, whether the claim in that case should have been one under the 1985 PDPA was not dispositive on the issue before the Court, which merely centered on the definition of "handicapped" contained in the jury instruction. *Id.* at 348, 524 S.E.2d at 574.

¶ 72        The term "handicap" is not defined in the 1977 EEPA.  However, our Court has held that the definitions contained in the 1985 PDPA apply.  *See McCullough v. BB&T*, 136 N.C. App. 340, 524 S.E.2d 569 (2000).

¶ 73        The 1985 PDPA defines a person with a disability as one who has a physical "impairment which *substantially* limits one or more major life activities" or is "treated as" having such impairment.  N.C. Gen. Stat. § 168A-3(7a) (emphasis added).

¶ 74        In her complaint, Plaintiff merely alleges that she has a heart condition that requires occasional treatment which *could* be impairing in the future if untreated and that her condition "impairs" her ability to walk and exercise.  However, she does not expressly allege that her condition *substantially* impairs these activities, nor does she allege facts which show that her condition substantially impairs these activities.  *See, e.g.*, *Burgess v. Joseph Schlitz*, 298 N.C. 520, 259 S.E.2d 248 (1979) (holding in an action brought under the 1973 Act that one is not "handicapped" who had glaucoma but who had 20/20 vision when wearing glasses).

¶ 75        Therefore, assuming it is appropriate for us to recognize a common law remedy in the face of the comprehensive remedies provided by the 1985 PDPA, Plaintiff's complaint still fails because of her failure to allege facts showing that she is a member of a protected class under the 1977 EEPA.

¶ 76        I conclude by noting to address Plaintiff's allegations that she was "wrongfully discharged" because of "(a) her disability, (b) the time she took off to have her

disability treated, and (c) Defendant's discrimination and preconceived notions about her future performance as an employee based on her disability."

¶ 77 Assuming North Carolina recognizes a common law claim and that Plaintiff has properly alleged such claim, Plaintiff cannot base her "common law" claim on Defendant's desire not to accommodate her (allowing her to attend doctor's appointments, etc.) Indeed, our Court has held that *the duty to accommodate* did not arise under the 1977 EEPA, but this duty is exclusive to claims brought under the 1985 PDPA. *Head v. Adams Farm*, 242 N.C. App. at 553, 775 S.E.2d at 909 (reiterating that the 1977 EEPA "does *not* impose a corresponding duty of reasonable accommodation by the employer"). Therefore, to succeed in her claim, Plaintiff must show how, based on her condition, she was treated differently than other employees without the condition. Plaintiff would have an almost impossible burden of showing that Defendant treated her differently based on her heart condition. Indeed, Plaintiff has admitted in her complaint that Defendant had a non-discriminatory reason to terminate her; namely, her failure to make a bank deposit for her employer for over a week. And she makes no allegation that some employee without a heart condition was *not* fired for similar conduct.